# THE CITY AND SUBURBAN RAILWAY COMPANY
## *vs.* THOMAS C. BASSHOR AND CO.

*Contract for the Construction of Boilers—Heating Surface—Economy in use of Fuel—Measure of Damages for Breach of Contract in Action on Common Counts.*

Plaintiffs agreed to furnish certain boilers, of 200 horse-power each, under a contract which designated the diameter and length of each boiler, and the number and size of the tubes. In the specifications referred to in the contract it was stated that "at the water tube boilers standard factor (11½ sq. ft. per H. P.), these boilers will give 1,000 H. P." *Held,* that the plaintiffs were not bound to supply boilers having each 2,300 square feet of heating surface for 200 horse-power, but that the amount of heating surface requisite was a matter of calculation from the figures mentioned in the contract.

Since the above contract contained no stipulation as to the quantity of fuel necessary to get the specified power, the plaintiffs were not bound to furnish boilers that would give 200 horse-power with the greatest economy in the consumption of coal.

When after a contract has been performed by the plaintiff he sues on the common counts for a balance due, he may recover damages at the rate of compensation fixed by the contract.

Appeal from Baltimore City Court. Action on the common counts in assumpsit by the appellees against the appellant to recover the balance of contract price of five boilers furnished to the appellant. Plea, the general issue. The appellees in February, 1893, submitted to the appellant a bid for five horizontal, tubular boilers, and other work connected therewith. In this bid, after specifying the diameter and length of shell, the diameter and heighth of dome, the number, diameter and length of tubes in each boiler, and specifying the fixtures, there was the following clause: "All fixtures of best standard makes. The above for each boiler. At the water tube boilers standard factor (11½ sq. ft. per H. P.), these boilers will give 1,000 H. P., and we guarantee them to stand 135 lbs. working pressure.

If well compounded engines are used, the capacity of the boilers will be equal to 1,250 H. P."

The contract between the parties provided that "Thomas C. Basshor & Co., in accordance with their specifications and bid of the 17th Feb. 1893, hereby agree to supply the City and Suburban Railway Co. for their temporary plant, the following boilers, etc., delivered and erected in running order, as follows : Five (5) horizontal return tubular boilers of 200 H. P. capacity each, each boiler 72," dia., 20 ft. long, shells of ½" plate, heads ¾" plate, all built of 60,000 T. S. steel, and containing 84 4" tubes, each boiler to be completely fitted with all the necessary fixtures, including one pop and one lever safety valve. Each boiler is guaranteed to carry a working pressure of 135 lbs. per square in., and is to be tested to 200 lbs. hydraulic pressure. Boilers to be complete in every respect, and furnished with all necessary casting for a complete brick setting.

The Court below (PHELPS, J.), granted the plaintiffs' prayer instructing the jury that according to the true construction of the contract " the plaintiffs are not obliged to prove, in order to recover, that each boiler has 2,300 feet of heating surface, nor are they obliged to prove that each of said boilers will give 200 horse-power with the best economy in the consumption of coal.

The defendant offered the following prayers :

1st. That under the contract the plaintiffs were required to furnish boilers that would supply horse-power in the proportion of one horse-power to eleven and one-half square feet of heating surface, and by the undisputed testimony of the plaintiff they did not furnish boilers that would supply horse-power in that proportion, and the plaintiff therefore is not entitled to recover the balance of the price agreed on in the contract as such. (Rejected.)

2nd. That under the contract given in evidence, the plaintiff was required to furnish boilers which, when measured by the standard factor of eleven and one-half square feet

of heating surface per horse-power, would give the necessary heating surface to furnish two hundred horse-power per boiler, to-wit: A heating surface of twenty-three hundred square feet of heating surface per boiler, and if the jury find that the boilers furnished by the plaintiff to the defendant under the contract did not each give this area of heating surface, but give a smaller area of heating surface, then the horse-power capacity of each boiler is to be ascertained by taking the standard factor of eleven and one-half square feet of heating surface as the area which will create a horse-power in the boilers, and the actual capacity of the boilers furnished is to be ascertained by dividing the actual heating surface of each boiler by this factor of eleven and one-half square feet of heating surface per horse-power, and the jury are to estimate the value of the boilers furnished by the plaintiff to the defendant, by the number of horse-power shown to be furnished by said boilers by this method of estimating the horse-power capacity of said boilers. (Rejected.)

3rd. If the verdict of the jury is for the plaintiff, it must be limited to the actual value of the boilers, less the amount paid by the defendant, and must not be based on the agreement to pay a stipulated price for the boilers contemplated in the contract.

The Court rejected the defendant's first and second prayers and granted the defendant's third prayer with the following addition : " But the jury are not precluded from considering the same as part of the evidence in the case."

The jury returned a verdict for the plaintiffs for $1,827.67.

The cause was argued before ROBINSON, C. J., BRYAN, McSHERRY, FOWLER, BRISCOE and ROBERTS, JJ.

*W. Irvine Cross* and *Geo. Dobbin Penniman* (with whom was *John K. Cowen* and *E. J. D. Cross* on the brief), for the appellant.

Although the appellees had apparently agreed to furnish boilers of such a total area of heating surface, that if the factor or standard was adopted that 11½ square feet of heating surface would produce a horse-power, the boilers would have sufficient heating surface to give one thousand horse-power, yet an actual measurement of the heating surface of the boilers as built showed that only 9½ square feet of heating surface was given for a horse-power, if the boilers were to give one thousand horse-power. At the factor or standard adopted, as the appellant claims in the contract, that it requires 11½ square feet of heating surface to economically develop a horse-power, each 200 H. P. boiler should have 2,300 square feet of heating surface, yet actual measurement showed conclusively that each boiler had only 1,983 square feet of heating surface. Suit was brought by the appellee upon the contract to recover the full amount of the contract price on the ground that the boilers were properly constructed. The appellant refused to pay the full amount of the contract price on the ground that it had been promised 11½ square feet of heating surface in the boilers for each horse-power, and that this amount of heating surface had not been given. The suit was for a balance due upon the boilers. Each boiler was found to have 1,983 square feet of heating surface, while the Railway Company claimed each should have 2,300 square feet of heating surface. In paying for the boilers, the Railway Company took 11½ square feet as the agreed area of heating surface required to produce a horse-power, and it divided this area (11½ square feet) into 1,983 square feet (the area of each boiler), which gave each boiler a capacity of 172 horse-power. As the price agreed upon for the boilers was on the basis of 200 horse-power per boiler, and the boilers only were of 172 horse-power according to the agreed factor of 11½ square feet per horse-power, the Railway Company paid Basshor & Co. 172-200 of the agreed price of the boilers and withheld the balance.

The area 11½ sq. ft. in water tube boilers is always

therefore a " factor " when multiplied by the number of horse-power a water tube boiler is guaranteed to give, the number of square feet which is the product, is the number of square feet of heating surface the boiler must contain if it is to come up to the guaranteed capacity. In the contract it is undoubtedly used in the sense of a " standard measure," which is to be applied by the Railway Company in determining the capacity of the boilers after they were furnished by Basshor & Co. The term " water tube boilers . standard " means that 11½ square feet has been recognized as the standard or " fixed and permanent " area which in water tube boilers will produce a horse-power, and that it is the intention of the parties to adopt this standard in measuring the boilers to be built under the contract, although the boilers were " return tubular boilers," which generally have a different and a larger area allowed per horse-power.

As this clause is a technical one, to a certain extent, the evidence of expert engineers was introduced to prove its technical meaning. Mr. J. B. Scott, the mechanical and electrical engineer, in charge of the extensive plant of the appellant, testified, " as to the water tube boiler standard factor of 11½ square feet for a horse-power, witness understood these boilers were sold in competition with some water tube boilers manufactured in town, and which rated . at 11½ square feet. In order to compete with these boilers the contract was made up. That expression means, that the number of square feet taken as a standard for a horse-power, should be multiplied by the rate of horse-power of the boiler, that is, 200 by 11½. The witness thought, as an engineer, that the phrase meant, that for every horse-power to be furnished by the boiler there should be 11½ square feet of surface.

The only effect of incorporating the " standard factor " clause in the agreement was to bind Basshor & Co. to give 11½ sq. ft. of heating surface for each horse-power. It was a clear limitation, which they imposed upon them-

selves, *not* to build boilers with a *smaller* area per horse-power, for, as has been shown, the smaller the area of heating surface per horse-power allowed, the greater the cost of running the boiler, *i. e.*, it must be "forced" or fired harder. This "standard factor" clause therefore at once fixed a standard to which the appellees must comply, and as there was no duty upon the Railway Company to check up the specifications, it cannot be held to lose the benefit of the *true* construction of the "standard factor" clause, because it did not detect the difference between it and the specifications, a thing it was not bound to do. The lower Court, therefore, erred in refusing to instruct the jury that the boilers must have 11½ square feet of heating surface for each horse-power of the 200 horse-power required of them.

The Court erred in instructing the jury in the plaintiff's prayer, that Basshor & Co. were *not* obliged to prove, in order to recover, that each of said boilers would give 200 horse-power, "with the best economy in the consumption of coal." By "best economy in the consumption of coal" is meant, of course, such economy as well regulated and carefully managed plants exercise. The counsel for the plaintiffs was permitted by the Court to argue to the jury, that under the contract the question of the amount of coal consumed by the boilers in order to generate 200 horse-power of steam had nothing to do with the case. Under this instruction it was only necessary for the jury to believe that 200 horse-power of steam could be obtained from each boiler, no matter how extravagant, excessive or ruinous might be the consumption of coal required to generate the 200 horse-power. The appellant claims that as the boilers were specially manufactured by Basshor & Co., on their own specifications, for the purpose of running the Waverly plant, as long as might be necessary, that it was an implied warranty on the part of Basshor & Co. that the boilers should be reasonably fit for the purposes for which they were purchased, and this "reasonable fitness" *must*

include the capacity to generate steam to the extent of 200 horse-power per boiler, " with the best economy in the consumption of coal." *Jones* v. *Just*, L. R. 3 Q. B. 197 ; *Rice* v. *Forsythe*, 41 Md. 403.

*John Prentiss Poe* and *Edgar H. Gans*, for the appellees.

The appellee's prayer truly interpreted the contract, while the 1st and 2d prayers of the appellant presented an erroneous interpretation and were therefore properly rejected.    The clause in the proposal relied on by the appellant, viz : " At the water tube boilers standard (11½ square feet per H. P.), these boilers will give 1,000 H. P., and we guarantee them to stand 135 lbs. working pressure," did not undertake to declare that the boilers should have each 2,300 square feet of heating surface and plainly could not have been intended to make such statement, because the heating surface was to be arrived at from a calculation of the precise dimensions stated in the specifications upon which the proposal was based.    All that was meant by the clause in question, was, as testified by Mr. Stebbins, that the heating surface of the *horizontal tubular* boilers contracted for would produce the same amount of steam, under certain circumstances, which *water tube* boilers of 11½ sq. ft. of heating surface per horse-power would produce under the same circumstances.    That the boilers contracted for and furnished could produce and did produce 200 horse-power was abundantly proved, and it was only agreed that they should each have 1,983 sq. ft. of heating surface, giving a horse-power to every 9½ sq. ft. of heating surface. This amount of heating surface they did, in fact, have, and thus the appellees clearly showed that they had complied in all respects with their contract and were entitled to recover the balance due them.

Fowler, J., delivered the opinion of the Court.

The City and Suburban Railway Company and Thomas Basshor and Company agreed in writing that the latter

should supply the materials for and manufacture and erect five horizontal return tubular boilers of two hundred horse-power capacity each, to be used by said Railway Company at its temporary plant at Waverly, on the York Road. These boilers, it was agreed, should be made in accordance with certain specifications furnished by Basshor & Co., the whole work to be completed and in running order not later than May, 1893. The work was finished and accepted by Railway Company, and the boilers have been used by it for more than a year. A part of the contract price was withheld upon the ground that the heating surface of the boilers was not as great as the contract called for, and to recover the amount claimed to be due them, Basshor & Co. sued the Railway Company in assumpsit on the common counts and recovered a judgment. During the course of the trial six exceptions were taken by the defendant to the rulings of the Court below, five of them relating to the exclusion of evidence and one to the rulings on the prayers. All of the exceptions, however, except the last named, have been abandoned, and, therefore, the only question we have to determine is whether there was error in granting the plaintaiff's prayer and refusing to grant the defendant's first and second prayer and in granting defendant's third prayer as modified.

By the plaintiff's prayer the jury were instructed that under the contract given in evidence "the plaintiffs are not obliged to prove, in order to recover, that each boiler has 2,300 feet of heating surface, nor that each of said boilers will give two hundred horse-power with the best economy in the consumption of coal." The contention of the defendant, as set forth in its second and third prayers, is based upon a construction of the contract the exact reverse of that contended for by the plaintiffs and contained in their first prayer, and to support its construction the defendant relies upon the following clause which will be found in the last paragraph of the specifications furnished by the plaintiffs, as follows: "At the water tube boilers standard factor

($11\frac{1}{2}$ sq. ft. per H. P.), these boilers will give 1,000 H. P. and we guarantee them to stand 135 lbs. working pressure." The defendants contend that the true meaning of this clause is that the plaintiffs were to furnish five boilers of the kind described in the contract, which, when measured by the standard factor of eleven and one-half square feet of heating surface per horse-power, would give a heating surface of twenty-three hundred square feet for each boiler. The plaintiffs, however, contend that under a fair construction of the contract in connection with the specifications, they were required only to manufacture and set up in running order five horizontal tubular boilers of 200 H. P. each, and that the amount of heating surface they agreed to furnish for each boiler is clearly shown in the specifications, which are a part of the contract. Testimony of experts was taken to show what is the true meaning of the terms used in the clause in question ; but, as might have been expected, the witnesses did not agree. In our opinion, whatever doubts may exist as to the construction of this particular clause standing alone, the meaning and intention of the contracting parties is clear when the specifications, on which the contract is based, are also considered. As one of the witnesses said, " the amount of heating surface in the boilers is in the figures given in the specifications, and it is simply a matter of calculation from these figures." Another witness testified that, notwithstanding the clause we are considering, it is very clear from the specifications that the boilers which the plaintiffs agreed to furnish were not to have the heating surface which is now demanded by the defendant. The construction relied on by the defendant cannot be maintained without putting aside a most important provision of the contract. Manifestly it would be contrary to all rules of construction to allow one of two or more doubtful constructions of one part of the contract to prevail over and nullify the manifest intention of the parties as declared in another part of the contract. It being conceded that the boilers, as to heating surface, are according to the specifications, the

plaintiffs must be held, in this respect, to have complied with their contract.

But in the next place it is insisted by the defendant that the plaintiffs were bound under the contract to furnish boilers that would give two hundred horse-power with the best economy in the consumption of coal.

We find in the contract itself no warrant for this contention. It is clear from the testimony that the power agreed to be given, viz., 200 H. P. for each boiler, was in fact obtained, but without regard to the amount of coal used. It will be observed, however, that the contract contains no stipulation as to the quantity of fuel it would be necessary to consume to get the stipulated power, and we are asked to introduce such a stipulation into the contract merely because we do not find it there, and in order to sustain the defendant's suggestion of an implied warranty. But there is no implied warranty under the facts in this case, for it is well settled " that where a known, described and defined article is ordered, even of a manufacturer, although it is stated to be required by the purchaser for a particular purpose, still, if the thing be actually supplied, there is no implied warranty that it shall answer the particular purpose intended by the buyer; in such case the purchaser takes upon himself the risk of its effecting its purpose." *Rasin & Co.* v. *Conley*, 58 Md. 60; *Rice* v. *Forsyth*, 41 Md. 389; *Seitz* v. *Brewers' Refrigerating Co.*, 141 U. S. 510. If the question as to economy of fuel had been in the minds of the parties, or of either of them, it would have doubtless been incorporated in the contract. But they are silent in regard to it, and we are asked to supply the alleged omission. But this we cannot do. As was said by the Supreme Court of the United States in *Seitz* v. *Brewers' Refrigerating Co.*, *supra*, " to hold that mere silence opens the door to parol testimony would be to beg the whole question." In this case we have seen the boilers had the stipulated heating surface and gave the required horse-power, and under the contract given in evidence the defendant cannot set up as a defence the fact, if

it be a fact, that the stipulated power cannot be obtained without an undue consumption of fuel. Hence, it follows that the plaintiff's first prayer was properly granted and the defendant's first and second were properly refused.

We think there was no error in granting the defendant's third prayer as modified. By it the jury were instructed that if their verdict should be for the plaintiff, it must be limited to the actual value of the boilers, less the amount paid by the defendant, and must not be based on the agreement to pay a stipulated price for the boilers contemplated by the contract. To this prayer the Court added the following, viz.: "But the jury are not precluded from considering the same as part of the evidence in the case," which is the modification complained of by the defendant.

The theory of the plaintiff's action is, that having performed their part of the contract, and there being nothing left to be done by the defendant except to pay the contract price, they were not bound to sue on the contract, but were at liberty to sue on the common counts for the balance due. *Ridgley* v. *Crandall*, 4 Md. 435; *Appleman* v. *Michael*, 43 Md. 273. The contract was offered in evidence without objection, and being properly before them, the jury had a right to consider it, as the Court told them, as part of the evidence in the case. And it would seem that the Court below might have properly gone further and could have instructed the jury, as was held in *Appleman* v. *Michael*, *supra*, that the proper measure of damages in a case like this is the rate of compensation fixed by the contract.

Finding no reversible error, the judgment appealed from will be affirmed.

*Judgment affirmed.*